JARSTFER *v.* JARSTFER.

DIVORCE—EXTREME CRUELTY.
A decree for divorce in favor of the wife for extreme cruelty is *held* to be sustained by the evidence.

Appeal from Kent; McDonald, J. Submitted April 19, 1910. (Docket No. 89.) Decided July 14, 1910.

Bill by Agnes Jarstfer against Frank A. Jarstfer for a divorce. From a decree for complainant, defendant appeals. Affirmed.

*E. J. Doyle,* for complainant.

*William B. Brown,* for defendant.

BLAIR, J. This is a bill for divorce. The parties were married May 22, 1900, the complainant, Agnes, being at that time 29 years, and the defendant 34 years, of age. Soon after the marriage the parties purchased a farm of 66 acres in the township of Ada, Kent county, from complainant's parents for the sum of $3,000. Complainant paid $1,200 and defendant paid $1,000 of the purchase price, and a mortgage was given back for the balance of $800. The farm was deeded to complainant and defendant, as husband and wife, by the entireties. The parties continued to reside on this farm until their final separation, which occurred June 28, 1907, at which time complainant removed to the village of Cannonsburg, where she has since resided with her mother. Defendant remained upon and still occupies the farm. Three children were born to the parties, as follows: Francis L., born October 10, 1903; Augustine, born May 18, 1906; and the third child, August 17, 1907. This child did not survive its birth, which occurred some two months after the separation.

The original bill of complaint charged defendant with extreme cruelty and prayed a decree for separate maintenance. The foundation of the bill was a charge of extreme cruelty, consisting of a continued course of fault-finding, nagging, aggravating and exasperating conduct on the part of defendant, as well as abusive, profane, and indecent language, and several instances of personal violence, resulting in serious injury to complainant, and in upholding, as against complainant, ill-treatment of her by the parents of defendant. The bill was subsequently amended so as to pray for an absolute divorce. Defendant, in his answer to the bill of complaint, denied in detail every allegation of cruel treatment and claimed to have always treated his wife with the utmost kindness and consideration, and by way of cross-bill claimed the right to a decree for an absolute divorce in his favor because of alleged extreme cruelty of complainant towards him, stating in great detail in his cross-bill alleged instances of her querulous fault-finding and unreasonable abuse and annoyance of him, and numerous occasions when, without just cause or any cause, she slapped him in the face and struck him otherwise, and insisted on having in the house certain of her relatives who were objectionable to him, and whom he had ordered to keep out of his home, and, also, that she called defendant many opprobrious names and charged that his mother was a prostitute, and did all in her power to inflame and anger him.

The testimony in this case was, for the most part, taken in open court before the late Judge Wolcott. Near the close of the case a settlement was proposed in open court by counsel for complainant, and an adjournment was taken for the purpose of arranging such settlement, if possible. No settlement was arranged and, Judge Wolcott having died, the case was resumed before his successor, before whom the complainant and defendant gave some testimony. Except as Judge McDonald had the advantage of listening to a portion of the testimony of the defendant and complainant and of observing their attitude

and conduct as witnesses, his consideration of the case, as ours must be, was based upon a reading of the testimony taken before his predecessor.

The complainant testified that when others were present defendant's treatment of her was very kind and considerate, but that when they were alone it was quite the contrary. Among the instances of trouble between herself and her husband upon which she relies, and which appear to be the most serious charges against him, we refer briefly to the following: The first trouble she says that she remembers was that one Sunday they went to church, leaving some young fowls at home which had not been taken care of, and she wished to return immediately from church to care for them; that, against her wish, her husband took her to his mother's house and stayed there longer than necessary; that his mother had had some pictures of defendant enlarged and asked her opinion of them; that she was provoked and wanted to get home and told her mother-in-law she had no choice—

"They were all alike to me, and she was very impudent about it; she says, 'You have no choice? Haven't you no eyes in your head?' And I did not answer her back any more."

That on the way going home they never spoke at all but when she asked him to get a pail of water he said he would not.

" * * * He said he wouldn't do anything for a God-damned, cursed thing like me.
" Q. Did he get the pail of water?
" A. No. * * *
" Q. Called you names?
" A. I believe he did; I am not certain, but I believe he called me a bitch."

The next trouble to which she refers related to their attendance at a wedding, when, as she claims, her husband kept her waiting for a couple of hours after she had got her wraps on to go home. After starting for home—

"I said to him: 'Frank, I wish when we get ready to

go home you would go and not leave me standing around waiting for you so long,' I said. 'A person might better be dead than waiting around and not knowing where he was, whether he had gone.' I don't know what I said; something like that.

"*Q.* What did he answer, if anything, when you said that to him?

"*A.* He said: 'God-damn, old hag, I wish to God you were dead. I have never had a moment's comfort with you since I married you.' * * *

"*Q.* What else was said going home?

"*A.* I told him to stop his swearing, and I slapped him with my hand.

"*Q.* What did he say then, or do?

"*A.* He slapped me several times going home that night. One time he threw me out of the buggy. The wedding was about three miles from home."

The next trouble involving physical violence occurred when defendant's mother was there. Complainant claimed that she was getting supper as fast as she could when defendant asked her what was the matter with her, "and after a while he swore he would put me in the poorhouse and swore: 'By Jesus Christ, Aggie, I will put you in the poorhouse * * *' or, 'I will put somebody in the poorhouse around here.' Those are the words he used. Then I slapped him with my hand." He then sprang up and caught hold of her neck and choked her for some time, and his mother loosened his hands from her throat and told defendant that complainant did not want her there and he better take her away.

"I told her if she was the cause of the trouble that the same roof could not be over us both, or some such words as that, and then he choked me again after that—about twice. I am not sure, but I think it was about twice that he choked me.

"*Q.* After you came out of the bedroom?

"*A.* Yes. He throwed me against the wall and slammed me down against the wall several times. Two or three times against the wall, against the floor, and the wall. * * * Then he slapped me with all his strength. * * *

"*Q.* Now, when did the next serious trouble arise between you?

"*A.* We never got along after that; there was no pretense of getting along.

"*Q.* No pretense of getting along at all?

"*A.* Frank was never even a friend to me after that."

The next charge of physical violence relates to an occasion when defendant put complainant's niece off the premises. He had before that time ordered the niece to keep off the premises, but on this occasion complainant had called her niece in from the road, to do an errand for her, and defendant, finding she was there, took her by the coat collar and put her off the place without, however, hurting her. After he had put her off the porch, complainant went down and put her arm around her and brought her back, and she claimed that in the struggle which ensued—

" He seemed to strike out—he did not push or did not strike me—but he seemed to strike out at me, and I must have been going towards him, or I don't know what I was doing.

"*Q.* Well, did you fall?

"*A.* Yes; I fell.

"*Q.* On to the ground?

"*A.* On my face.

"*Q.* When you got up were you bleeding?

"*A.* Yes; my nose was bleeding.

"*Q.* What did you do after that?

"*A.* I picked up a stone, and said: 'I ought to hit him,' told him I ought to hit him. Then I tossed the stone over and he caught it. I did not hit him with the stone. He caught the stone in his hand. * * * Later in the night he choked me. We were quarreling and he began calling my—

"*Q.* Later, when?

"*A.* The same evening.

"*Q.* How did that happen?

"*A.* He was calling my relations dirty names that I could not stand, and I said I would slap his mouth. Something like that. And he caught my throat and pushed me up against the door and choked me. * * * A few nights after that; after I got my work done, it was

late, I had a lot to do; and he—it was some trouble that came about the baby being left in the bed; the baby was sick, vomiting, and I thought that he left the baby in the bed just without any protection at all, just because he see me sitting down and wanted to give me some work to do, and I told him so, and during the quarrel he began about my relatives again, calling them some dirty names that I cannot remember what they are, but I know they were not— they were some bad names, and I took my elbow and hit him with it. I had the baby in my arms at the same time. I could not have hurt him. He gave me a blow on the side of the head then, right there on the side of the head (indicating).

"*Q.* Did it blacken your face or head?

"*A.* Blackened my ear, and my head was all sore, and shoulders, from the night before; my whole side there; every bone in me there was sore and bruised.

"*Q.* When was the next time after that that he struck you?

"*A.* He did not strike me after that.

"*Q.* That was the last?

"*A.* That was the last time he struck me."

The immediate cause of complainant's leaving defendant was, as she claimed, trouble with his father with reference to the care of the baby, because of which the father, who was past 80 years of age,—

" Jumped up and run over and struck me on the head and face and tried to push me back into the dining room and gave me quite a beating at that time.

"*Q.* Make your nose bleed?

"*A.* Yes.

"*Q.* Mark your face?

"*A.* Yes.

"*Q.* Bruise and blacken it up considerable?

"*A.* Yes; bruised me around my shoulder and arms.

"*Q.* Strike you on the arms?

"*A.* Yes.

"*Q.* On the body or breast?

"*A.* I don't remember where else he struck me; I know he struck me on the shoulders and arms and breast.

"*Q.* Blackened both of your eyes?

"*A.* No; I don't think both of them were blackened.

"*Q.* Blackened one of them?

"*A.* Yes, sir.

"*Q.* Blackened your face?

"*A.* Yes, sir.

"*Q.* That was some time in June last?

"*A.* Yes; my nose was cut right down there, dented in, and sore for some time afterwards."

On the morning of that day complainant testified that defendant's father had struck her and she went down to the field after her husband to come up and take care of her, but when he came up he began to abuse her and call her names and abuse her relatives and call them such names as " old bastards " in the presence of his father, and in nowise took her part or endeavored to protect her.

Defendant contends that complainant was entirely in the wrong in all of these transactions and that he had done nothing whatever to justify her conduct, and the record indicates that, so far as physical violence is concerned, in most of the instances relied upon by complainant, she was guilty of the first act.

A determination of the merits of this case must depend largely upon the credibility of the complainant and the defendant. The circuit judge evidently gave credence in the main to the complainant's version of the facts, since he granted a decree in her favor. While the great mass of the testimony was not given before the circuit judge who rendered the decree, the complainant and defendant were recalled and testified with reference to some of the prominent facts of the case before him, so that he possessed some advantage over us with reference to determining the credibility of the witnesses.

It is difficult to accept the testimony of the defendant as being entirely candid. As disclosed by the record, he was a large, able-bodied, powerful man, able to handle the complainant as he would a child, as the complainant must have known. Under such circumstances, it is inconceivable that complainant would have made the attacks upon him which she admits she did without any occasion therefor whatever, and we are satisfied that, as claimed by the complainant, he goaded her by his allusions

to her relatives and friends, and upholding his parents against her, to a condition of rage which she was unable to control.  It is clear that in many things the complainant was in the wrong and defendant was within his legal rights, as, for instance, in removing her niece from the premises; but, on the whole, we are inclined to the belief that he did this, not so much because of his desire to protect the morality of his home, as to aggrieve his wife. This is indicated by his final testimony :

"I don't mean to say she was a girl of immoral character or anything of that kind, but I saw her go in the barn with a young man and they were there until morning. This young man lives there in the neighborhood.   I didn't want her to come in there after they tried to prosecute me for telling what is true about her.   I know they tried to prosecute me because the prosecuting attorney wrote me a letter that I should come there."

The defendant denied that complainant told him that his father had struck her when she came to the field in the morning, but merely that his father was interfering with the baby.   We think the version of the complainant is the more probable one, particularly in view of the occurrence of the afternoon, which occasioned her leaving, the effects of which were visible and testified to by other witnesses.   While we have no doubt that the complainant exaggerates the occurrences to which she testifies, and that she was quick to anger and had become, perhaps, morbidly suspicious, still we are satisfied that, in the main, she was endeavoring to tell the truth and narrated the things which bore against her as well as those that were in her favor.   On the other hand, we are satisfied that the defendant was not candid in his statement of the facts, but was endeavoring throughout to suppress the things which might afford some justification for his wife's conduct, and to exaggerate and enlarge upon the things which were in his favor, as in the instance of calling the Catholic priest, the parties both belonging to that church, and stating to him beforehand the case against his wife

in its harshest features without any mitigation and with a desire to have the priest, influenced by his statement, call upon his wife and advise her to keep her relatives away from the house.

We have, therefore, concluded, upon a review of the whole case, that the circuit judge reached the right conclusion, and his decree is in all things affirmed.

OSTRANDER, HOOKER, MOORE, and STONE, JJ., concurred.