EMERY v. EMERY.

1. DIVORCE—EXTREME CRUELTY—PROFANITY.

The use of profane language by a husband toward a refined wife constitutes extreme cruelty and is ground for a divorce.

2. SAME—IMPROPER CONDUCT—EXTREME CRUELTY.

Evidence that defendant had violent fits of anger and used profane language toward his wife, pointed a loaded revolver at her, forced her out of the house and locked her out, that he was harsh in his treatment of her before her confinement, and domineered over her, and showed her but little affection, also tending to show that he was not an affectionate or considerate husband, and his conduct made it impossible for them to live together, entitles complainant to a decree of divorce, notwithstanding that complainant was nervous and at times inclined to parade her troubles before her parents.

3. SAME—APPEAL AND ERROR—EVIDENCE.

Notwithstanding the court below had the advantage of seeing and hearing the witnesses, this court, on appeal, is

not relieved from the duty of exercising its own judgment in passing upon the evidence in the case.

4. SAME—HUSBAND AND WIFE—ALIMONY—SEPARATION AGREEMENT—PROPERTY INTERESTS.

An agreement entered into by a husband and wife, after their separation and after the starting of divorce proceedings, settling their property interests, where fair and free from collusion, is not only lawful but commendable.

Appeal from Genesee; Wisner, J. Submitted April 27, 1914. (Docket No. 146.) Decided June 1, 1914.

Bill by Harriet Z. Emery against William J. Emery for divorce. From a decree for defendant, complainant appeals. Reversed.

*William V. Smith,* for complainant.

*John F. Baker,* for defendant.

STONE, J. The bill of complaint in this cause was filed by the wife to obtain a divorce from the husband on the ground of extreme cruelty. The parties were married January 27, 1909, at which time the complainant was 24 years of age and the defendant 25. They lived together until July 6, 1910, when they separated. One child, Max Earl, was born January 27, 1910, just one year after the marriage.

The specific acts of cruelty charged in the bill are to the effect that soon after their marriage defendant was guilty of coarse and unkind treatment of complainant, cursing and swearing at her; that complainant was a person of religious convictions, and, when able, a regular attendant upon church; that defendant seldom spoke kindly to her, but had fits of violent anger, at which times he used profane language and cursed her, and the specific language used is stated in the bill. She further complains:

"That he kept a loaded revolver in their room in plain sight, and your oratrix was by his conduct and

the presence of such revolver kept in a state of nervous excitement and fear. That during the period of her pregnancy defendant's conduct continued to be the same. That on one occasion, and about three weeks after the birth of her child, defendant pointed the revolver toward your oratrix, and seized her and said he would as soon shoot her as to look at her. That soon after the birth of her child defendant, and on such occasions as defendant was not working, refused to get up and build the fire, and your oratrix was obliged to do so, although she was not recovered from the illness attending her confinement. That his course of cruelty continued up to the time of their separation in July, 1910, and he continually found fault with your oratrix, and required her to work beyond her strength, and on two occasions she was obliged to call on the police for protection. That he forcibly put her out of the house on July 5, 1910, and she returned that night, but next day she left him because of his violence."

In her bill she prayed for the care and custody of the said child until he should attain the age of 14 years.

In and by his answer the defendant denied that he treated complainant in a cruel manner; denied that he had fits of violent anger, or that he was habitually profane. Quoting the language of the answer he—

"Denies that he ever pointed the revolver at her and said that he would as soon shoot her as look at her; denies that he habitually found fault with complainant; denies that he required her to work beyond her strength. Defendant admits that he kept a loaded revolver in the house, which he did as a protection, and as any householder might do, and for the further reason that there were a number of hoboes seen in that vicinity; although the revolver was kept in the house defendant denies that the complainant was kept in a state of nervous excitement and fear, for this defendant had taught the complainant the use of it, and she felt it rather a protection than a menace and danger; however, this defendant did, upon one occasion, after they had retired at night, pick up the revolver from the dresser, and state to the complain-

ant that some men would just as soon shoot her with a revolver lying so near by, if she provoked them as she did this defendant, which act and suggestion on the part of this defendant was more to close their discussion than as being in earnest about the matter."

After denying that complainant was compelled to build fires he further answered:

"Defendant admits that complainant called the police upon one occasion when they were living together, and that the police were called to interfere upon the occasion of the complainant's father's assault upon this defendant at the store of Smith, Bridgman & Co., the day upon which this complaint was filed; but upon the first occasion there was absolutely no justification for her action, and this defendant believes that she was influenced in doing so by her parents, particularly her mother, as they lived only a few doors away, and the whole episode was the outgrowth of this complainant insisting on going to her mother's in the evening time and taking their six months old child with her, which this defendant objected to, as the child was suffering from a cold at the time, and, because of the defendant's not allowing her to take the child, her father and mother both came down and started a 'rough house,' and this defendant was compelled, in order to protect himself in the premises, to gently escort his mother-in-law to the wrong side of the door from her point of view, as she went one better than the proverbial mother-in-law, his father-in-law showing some better sense, and behaving very sensibly in the premises by betaking himself from the premises after this defendant had kindly pointed out to him that it would be much more healthy and more dignified for him to do so, although he came there with 'blood in his eye,' and vowed vengeance on his 'vicious' son-in-law, and despoiler of their religiously inclined and much abused daughter's peace and happiness."

The foregoing flippant and pert language of defendant is characteristic of his entire answer and testimony.

Defendant claimed the benefit of a cross-bill, and

asked for affirmative relief, mainly upon the ground that complainant was under the control and domination of her mother and would not obey him. He also prayed for the care and custody of the child.

We cannot undertake to quote the testimony pro and con in the case. Upon the charge of the use of profane language by defendant to complainant, shortly before her confinement, the testimony of complainant is corroborated by that of witnesses outside of the family. In fact defendant does not deny such conduct, but testified that he may have used profanity, but did not recall it, saying:

"I had no idea it would be remembered, because it had no significance. I said the incident was of such small significance that I never remembered it."

This court has held that it is extreme cruelty for a husband to swear at and curse a refined wife. On several occasions such language was used without any provocation. *Briggs* v. *Briggs*, 20 Mich. 34; *Warner* v. *Warner*, 54 Mich. 492 (20 N. W. 557).

The revolver incident and the occasion when defendant forced complainant out of the house and locked her out, seem to be established by the evidence. These are a part only of the improper conduct of the defendant. The general trend of the evidence is to the effect that defendant was possessed of an exacting and domineering disposition. His great dislike and aversion of his mother-in-law led him to harsh and cruel conduct toward his wife. He was very exacting and harsh in the treatment of complainant before her confiement, and seems to have had but little affection for her, and was most concerned in demonstrating that he was the ruler of his own house.

That she was nervous during the period of her pregnancy, and at times petulant, might well be expected. Defendant on direct examination testified:

"She would want an argument. It was useless for

me to keep quiet for all she would do then would be to go in a corner and cry; she wanted to have it.

"*Q.* Did she seem more contented to have a little chewing match?

"*A.* Yes, sir; it seemed to relieve the pressure.

"*Q.* Did she seem nervous? Was she sick?

"*A.* She was sick.

"*Q.* She was not well?

"*A.* No.

"*Q.* Her temperament was unusually irritable wasn't it?

"*A.* I believe it was.

"*Q.* She seemed depressed?

"*A.* Yes, sir; some little excitement seemed to do her good."

On cross-examination he testified that complainant would want to "scrap," and he would "scrap" with her, "anything to oblige her." The whole testimony tends to show that defendant was very far from being an affectionate and considerate husband. By his conduct the parties have drifted so far apart that we are satisfied that they can never live together in any proper manner. As this court said in *Utley* v. *Utley,* 155 Mich., at page 259 (118 N. W. 933), so we say here:

"We are impressed that the parties should be relieved entirely of the relations entered upon with their marriage."

The circuit judge tried to bring about a reconciliation, but failed, and then dismissed the bill of complaint, and gave no relief to either party. The fact, if it be a fact, that complainant was nervous, and perhaps paraded her troubles before her parents more than was wise, does not disentitle her to relief.

In the consideration of the case we have endeavored to give due weight to the advantage which the circuit judge had in seeing and hearing the witnesses give their testimony in open court. This, however, does not relieve this court from the duty of the exercise

of its own judgment in passing upon the evidence in the case.

After the separation, the parties entered into an agreement relating to their property matters. Such agreement seems to have been fair and free from collusion. This court has consistently held that, after actual separation, or the launching of a bill for divorce, amicable settlements between the parties of their property interests are not only lawful, but are to be commended. *Randall* v. *Randall,* 37 Mich. 563; *Palmer* v. *Fagerlin,* 163 Mich. 345-349 (128 N. W. 207); *Nichols* v. *Nichols,* 169 Mich. 540-542 (135 N. W. 328).

An examination of the whole record satisfies us that the defendant has been guilty of such continued and persistent extreme cruelty as to entitle the complainant to a decree from the bonds of matrimony.

The decree of the court below will be reversed, and a decree entered here, granting complainant a divorce, and giving her the care and custody of her child.

Complainant will recover against the defendant her costs of both courts to be taxed.

McALVAY, C. J., and BROOKE, KUHN, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.