# JANUARY TERM, 1916.*

---

McCUE *v.* McCUE.

1. DIVORCE—EXTREME CRUELTY—EVIDENCE—SUFFICIENCY — HARSH CONDUCT.

Where the principal charge of complainant, in a proceeding for separate maintenance, was that her husband was harsh, profane, and unkind, that he threatened to break her neck and sometimes indulged in similar violent and threatening language, though there was slight evidence of physical cruelty towards complainant, who was a refined woman, and feared him because of his threats of violence, the trial court was not in error in finding defendant guilty of extreme cruelty.

2. SAME—GROUNDS OF DIVORCE.

Extreme cruelty is not confined to physical violence, but any such continued course of conduct as renders the marriage relation intolerable, and drives the wife away from home, is sufficient as a ground for a decree.

3. SAME—SEPARATE MAINTENANCE—ABSOLUTE DECREE—DISCRETION.

The court may, if it deems it expedient, grant an absolute divorce, rather than a separate maintenance as prayed for in the bill, and, *held*, under the evidence, that the decree of the lower court should be so modified as to grant a divorce on the ground of cruelty.

Appeal from Menominee; Flannigan, J. Submitted January 20, 1916. (Docket No. 104.) Decided March 31, 1916.

Bill by Matilda McCue against William H. McCue for divorce; amended on the hearing to ask for separate maintenance only. From a decree for complainant, defendant appeals. Modified and affirmed.

---

*Continued from Vol. 190.

*Sawyer & Sawyer,* for complainant.

*Michael J. Doyle,* for defendant.

STONE, C. J.   This is a divorce case.   The parties were married on the 25th day of December, 1882, at the city of Menominee, and they had lived and cohabited together as husband and wife nearly all of the time between that date and a few days prior to the filing of the bill of complaint, which was on December 6, 1913.   They have two children, both boys, now grown to manhood.   Ernest A., the elder son, was 29 years of age when the bill was filed, and was married and living in Menominee.   The younger son, Ellis R., was 23 years of age at that time.   Early in his married life the defendant was a millwright by trade, and worked in and about sawmills at good wages for a number of years.

The bill of complaint is very lengthy, and sets forth many grounds of complaint against the defendant, charging him with extreme cruelty and failure to properly support the complainant.   A few acts only of personal violence are alleged in the bill; but it is claimed that the defendant by a long course of harsh conduct, in which he had been rough, profane, and threatening, has brought about such a condition of things that complainant was afraid of him and feared personal violence.   The complainant, while not highly educated, is a woman of refinement and good character.

In her testimony at the hearing the complainant went into great detail as to the conduct of the defendant toward her, and toward the boys when they were living at home.   There is no doubt that the defendant has been severe and unkind to his wife, but the evidence shows very little of personal violence.   Some of the threats and vile language claimed to have been used by the defendant toward complainant were made and used some years before the final separation; but

it is urged that because of his subsequent conduct it became proper for complainant to show these things, and that the circumstances were such that the original offenses were revived, and might be used as a ground for divorce. See *Eistedt* v. *Eistedt,* 187 Mich. 371 (153 N. W. 676), and cases there cited.

We shall not here attempt to set forth the substance of the testimony. The following, however, is a fair sample of the conduct of the defendant, as testified to by the complainant at great length. She testified as follows:

"I went over to see a dentist one day—this was two years ago—and my husband promised then he would give me money the 1st of the month; so I went over and I had my teeth fixed, and when the 1st of the month came he refused to give me the money. The bill came in, and he looked at it and said it was my bill; he wanted me to pay it. He said I should get that money from the boys. Then I mentioned it a couple of times, and the last time I spoke of it he wanted to know if I had paid it, and I told him, 'No,' I didn't have the money, and he said I should get it from the boys, and he came out in the kitchen where I was washing dishes, and he said if I would give him much of my lip—He swore, and said he would break my neck. He said: 'If you give me much of your lip, I'll break your God damned neck.' When he told me that, he was very cross, and came right for me, and I went outdoors, and I called up my son and told him what had happened—my son Ernest, who was at that time working for the J. W. Wells Lumber Company. I said to my son: 'Now, if you will tell me you will be here, I will come back in the house. Otherwise I am afraid to come in.' I was afraid because of the way he acted."

There was no evidence of any extravagance on the part of complainant. As tending to show his conduct to humiliate her, she testified as follows:

"We used to trade with Mr. Bruce, the grocer. One time we ran out of potatoes. We used to get potatoes

from the farmers mostly, and Mr. McCue said . he wanted to get them from the farmers. I thought it was all right if he wanted to, but we had been without potatoes several days, and I thought I would just go to Mr. Bruce and get a half bushel, and later we would get some from the farmers. I got the potatoes, and some days later Mr. Bruce told me that Mr. McCue had told him not to let me have anything more unless I would pay for it myself. All the words I had with Mr. McCue about this was he was sitting on the porch when I came home, and I guess he mistrusted I had been down there, and he says: 'Well, you didn't find it so very easy this time; it wasn't quite so nice this time, was it?' I didn't make him any answer."

Complainant further testified:

"About six or seven years ago Mr. McCue went West. He was gone several months. He made no provision for any support while he was gone. He put in the papers a notice that he wouldn't pay any bills contracted without an order from him. At that time Ernest was in Chicago working for Marshall Field & Co., and Ellis was at home. I think Ellis was in school yet."

The following was the notice published at that time:

### "Notice.

"All persons holding a charge amount against Wm. H. McCue must present an order for same with the bill, or the account will not be paid. I will pay no account without an order attached.

"WILLIAM H. McCUE."

After complainant left the home, and immediately before the bill was filed, defendant published the following:

### "Trust Her Not.

"Whereas my wife, Matilda McCue, has left my bed and board without just cause or provocation, this is to warn all persons not to trust her on my account, as I will pay no bills of her contracting after this date.

"Menominee, Mich., Dec. 5, 1913.

"WILLIAM H. McCUE."

Complainant testified that about three years before that time defendant kicked her out of bed. She testified:

"Q. In the night?

"A. Well, I guess it was in the morning. I think early in the morning.. The occasion of his becoming angry was I wasn't well at the time, and wasn't able to meet his demands. Not being able to meet his demands, he got angry. It was in cold weather. The room was cold. He pushed me clear out of bed. I got cold and chilled, so I didn't feel well for a good many weeks after.

"Q. Were you sick?

"A. I was not well at that time.

"Q. State whether or not from that time you took separate rooms.

"A. Well, he told me to take separate rooms until he told me to come back.

"Q. Did you?

"A. I did so at his request."

An instance was testified to of defendant's rough conduct towards his youngest son in the presence of complainant. When the son Ellis was 15 years of age defendant locked him out of the house one night because he came home a few minutes late, and the boy was kept out all night. Complainant testified that defendant when angry would frequently call her "a son of a bitch." She also testified that when angry at her one night he said that he hated her so that he could not bear to look at her; that she had better look out; that she would not be safe there; that he could split her in two like he would a rail; that he also said, "I don't see how you stand it the way I treat you and the names I call you; you are the biggest fool to stand it"; that she had better see a lawyer; that he had his lawyer already; that he would follow her all right; that she could not get much; that she could not get out of the house, and if she did get out it would be in a box, the both of them, but he said he did not want to

put his hands on her, but, when he did, it would be all off with both of them, and that she was in danger. The foregoing is but a small part of the testimony of the complainant. In much of it she was corroborated by the testimony of her sons. Some of these instances were denied by the defendant, and some of them he attempted to modify or explain. There was a conflict in the testimony of the parties, but, in our opinion, the trial court was in better position than we are to pass upon this conflict, as he saw the witnesses and heard them testify. The court below found that the defendant was guilty of extreme cruelty as charged in the bill, and that he, being of sufficient ability to provide a suitable maintenance for the complainant, had grossly refused and neglected to provide for complainant a suitable maintenance. It was the claim of complainant that she lived in fear of the defendant, because of his repeated threats to do her bodily injury.

A reading of the record shows that much of the trouble between the parties grew out of financial matters. That the defendant was penurious and small in his treatment of complainant clearly appears; yet it cannot be said that she suffered for the absolute necessaries of life. As a rule, the house was properly supplied with provisions; yet he was niggardly in his personal treatment of complainant, in those little, common, everyday matters that go so far in making married life pleasant and comfortable.

In her bill of complaint the complainant claimed that defendant had property amounting in value to $40,000. In his answer he claimed that he did not have property to exceed in value one-fifth that amount, and upon the hearing he claimed that he was not worth to exceed $4,500. Complainant testified that defendant threatened to so dispose of his property as to leave her without any apparent means of support. This was a disputed question upon the hearing.

After most of the testimony was taken the circuit judge attempted a reconciliation, and in a measure succeeded. The complainant returned to live with defendant for a number of weeks. But soon the old troubles were revived. They were evidently far apart, and complainant testified that defendant again angrily ordered her out of the house, and said, "You get out of here just as quick as God will let you," and she went. It is evident that defendant has great animosity toward the complainant and the two sons. A subsequent assault upon the older son and his letters to his wife in which he said he hoped he would never see her again, and that she and the boys could take one side of the world, and he would take the other—all of these things and many others indicate that the parties are too far apart to ever become reconciled. That the use of profane language by a husband toward a refined wife constitutes extreme cruelty and is a ground for divorce has been frequently held by this court. *Emery* v. *Emery*, 181 Mich. 146 (147 N. W. 452), and cases there cited.

'We are satisfied from the evidence that in the use of threatening and violent language, harshly scolding and reprimanding the complainant, the conduct of the defendant has been such as to render him guilty of extreme cruelty. It is well settled in this State that extreme cruelty is not confined to physical violence. And any such continued course of conduct which, without fault of the wife, results in making the marriage relations unbearable and in driving her from her husband's home, is extreme cruelty under many of our decisions. We are not disposed to disturb the finding of the circuit judge upon the subject of extreme cruelty. We are somewhat in doubt as to whether a case for failure to support was made by the evidence.

As was said by this court in *Utley* v. *Utley*, 155 Mich. 258 (118 N. W. 932) :

"We agree with the learned circuit judge in finding that the charges of cruelty are sustained. These are charges of personal violence and of threats to do compainant personal injury, the effects of which are to make her nervous and constantly afraid. We are impressed that the parties should be relieved entirely of the relations entered upon with their marriage, and that a disposition of the property should be made which will render personal relations of any kind unnecessary and unlikely to occur."

The bill of complaint, as originally drawn, prayed for a divorce *a vinculo* and for alimony. By application of complainant's counsel in open court pending the hearing the prayer of the bill was amended so as to ask for separate maintenance only, instead of a decree for divorce. The court below granted a "divorce from bed and board forever, but not otherwise from the bonds of matrimony, and that the marriage between said parties be and remain otherwise in full force, and that the said complainant is entitled to separate maintenance from said defendant."

No finding was made relating to the value of the personal property of the defendant, and we take it from the record that the court did not find that the defendant was possessed of any considerable amount of personal property, nor do we so find. The entire value of the real estate of the defendant, including the value of the homestead, which is owned jointly by the complainant and defendant, aggregated $4,425. The value of the homestead, as found by the court, was $1,300. The court decreed that the parties were to own each an undivided half interest in the homestead, but that the defendant should have possession thereof, paying to complainant a rental of $7.50 per month for her undivided one-half, and to keep the same in proper repair. The court assigned to complainant a house and lot valued at $550, and another parcel valued at the sum of $800.

While we are not inclined to disturb the conclusion of the court below in finding that the charge of cruelty against defendant was sustained by the proofs, yet we are not satisfied with the disposition which the court made of the case.   There is abundant proof to show that these parties have become so estranged that it will be impossible for them to resume their relations as husband and wife.   We think that this record presents a case for the exercise of the discretion conferred by the statute to grant to complainant a divorce from the bonds of matrimony, and deem it for the interests of the parties so to do.   We think that under the provisions of Act No. 324, Pub. Acts 1907 (3 Comp. Laws 1915, § 11399), it is the duty of this court to grant to the complainant an absolute divorce, following the practice of this court in *Horning* v. *Horning,* 162 Mich. 130, 132 (127 N. W. 275), and *Coon* v. *Coon,* 163 Mich. 644 (129 N. W. 12).

The decree below will also be modified in this regard:   The homestead, consisting of lot 1 of block 10 of N. Ludington Company's First Addition to Menominee, will be assigned and decreed to the said complainant as her sole, separate, and absolute property in fee. This provision is made in lieu of the dower of the wife in the real property of the defendant, and such provision shall be in full satisfaction of all dower and other claims that complainant may have in any property or real estate which the defendant owns, or may hereafter own, or in which he may have any interest.

Pending the appeal in this court the defendant has been paying by our order to the complainant the sum of $25 per month since the date of the decree of the court below.   The decree of this court will provide that the defendant shall hereafter until further ordered pay to the complainant the monthly sum of $20, the exact time of payment to be fixed by the decree, and for the payment of the same complainant will have a

lien upon all the remaining real estate of the defendant. It will be observed that this provision will release to the defendant the other real estate set over to the complainant by the court below.

After the case reached this court $100 was allowed for solicitor's fees and expense of appeal. A further solicitor's fee of $30 in this court will be paid to complainant's solicitor by the defendant, and the same will be provided for in the decree.

The decree below, as thus modified, will be affirmed.

Kuhn, Bird, Moore, Steere, Brooke, and Person, JJ., concurred. Ostrander, J., did not sit.