LUND *v.* LUND.

1. DIVORCE—EXTREME CRUELTY—EVIDENCE.

In wife's suit for divorce on ground of extreme cruelty, evidence from which it appears defendant attempted to dominate her and their children in a dictatorial, cruel, abusive and iron-handed manner, *held*, on *de novo* review, sufficient to establish ground for divorce.

2. SAME—DIVISION OF PROPERTY.

In suit for divorce wherein trial court denied relief to plaintiff wife, where record supports her claim for relief and raises inference that accumulation of property in course of 23 years of marriage was the result of their joint efforts, she is awarded such household furniture as she removed from the home at time of separation, and a reasonable amount for support of herself and such children as are under 17 years of age until they reach such age, attorney fees, expenses of suit, custody of two youngest children, and costs of both courts.

WIEST and SHARPE, JJ., dissenting.

Appeal from Kent; Brown (William B.), J. Submitted January 4, 1944. (Docket No. 8, Calendar No. 42,348.) Decided April 3, 1944.

Bill by Amelia J. Lund against Charles W. Lund for divorce on ground of extreme cruelty. Bill dismissed. Plaintiff appeals. Reversed and remanded.

*Edward H. Benson,* for plaintiff.

*Linsey, Shivel, Phelps & Vander Wal,* for defendant.

Wiest, J. (*dissenting*). June 2, 1942, plaintiff filed the bill herein for divorce, charging defendant with extreme cruelty in calling her vile and opprobrious names, swearing at her, using violence upon her person, coming home intoxicated, and neglecting her welfare and that of their children. Defendant, by answer, specifically denied the charges. Plaintiff appeals from a decree dismissing her bill.

The parties were married in January, 1919, and have five children, all girls, ranging in ages from 21 to 7 years. The two older girls had left home and were working in Grand Rapids. Defendant was a locomotive engineer, in the employ of the Pere Marquette Railroad Company, operating a freight train. In the four years immediately preceding the filing of the bill the parties lived on a 40-acre farm near the village of Sidney, Montcalm county, but did no farming. The payroll records of the railroad company show that defendant in 1942, up to December 15th, earned $3,207.33, after deduction of pension, insurance and things like that. Plaintiff left defendant June 1, 1942, and went to Grand Rapids and the next day filed the bill herein.

Plaintiff testified that in February, 1942, defendant took her by the neck, pushed her against the wall and hit her in the stomach. This defendant denied. Plaintiff claims two of her daughters had musical ability but were denied opportunity of developing the same by way of attending entertainments or having an instructor.

A witness called by defendant, upon cross-examination, was asked:

"*Q.*   *   *   * You have heard Mr. Lund swear at or toward Mrs. Lund?

"*A.* No more than they swear at each other.

"*Q.* You heard Mrs. Lund swear?

"*A.* I have heard her swear at Charlie, you bet I have."

Defendant had an automobile and in 1942 used it to drive 18 miles to his work at Edmore. Plaintiff claims that in 1942 she was deprived of the use she had formerly had of the car when she had driven it 300 or 400 miles a month.

Two of the daughters testified that the father would come into the kitchen and strike their mother and say it was in fun. It might have been more than a light love tap but we are not inclined to disassociate the tap from his contemporaneous declaration of intention.

At the time plaintiff left the home and went to Grand Rapids she had a moving van come and she stripped the house of practically all its furnishings, leaving defendant the second-best radio, a chair, one bed, no sheets, a cotton blanket, one pillow, no pillow cases, an old kitchen table, and he paid her $50 for his own kitchen range.

Plaintiff complains that she had to make over for the younger children the clothing the older children had outgrown. This was no more than a commendable act.

The daughter, Charlotte, 14 years of age, testified that about six months before the parties separated she heard her father use swear words towards her mother, calling her vile and opprobrious names, and he stated he was going to take her clothes off and hang her to a telephone pole and let her freeze. Defendant denied this charge and, we are not prepared to say it was established.

A reading of the record brings us to a conclusion in line with that of the trial judge, that the reason for disagreement in this family arose over a desire of the father to exercise supervision over his children and the unwillingness of the mother to cooperate. The father was opposed to the girls reading love stories and cheap magazines and the mother could see no harm in such indulgence. He opposed

the visits of a young man who was a probationer, paying attention to his 13-year-old daughter, and to a married man keeping company with an older daughter. Defendant's duties kept him from home for days at a time and what went on in the home during his absence was learned, mainly, from the neighbors and was contrary to his wishes and his desire for the welfare of the children.

Defendant carried a $3,000 life insurance policy, payable to his wife. Up to the time of the separation defendant supported his family and provided the home with suitable furnishings.

This is an instance where the weight to be given the testimony rested upon a view of the witnesses, their demeanor and disclosed partisanship. The circuit judge had this advantage over our review on the printed record and of right employed the same in reaching his decision and, upon review, we find no occasion to disturb his findings.

Plaintiff moved for a rehearing in the circuit court alleging she could produce additional evidence. Plaintiff was aware of such evidence at the time of the hearing, so it was not newly discovered, and the court very properly denied a rehearing.

The decree in the circuit court should be affirmed.

SHARPE, J., concurred with WIEST, J.

STARR, J. I cannot agree with Mr. Justice WIEST's opinion which affirms the trial court's dismissal of plaintiff's suit for divorce. Careful study of the record is firmly convincing that had this court occupied the position of the trial court, it would have reached a different conclusion.

A supplemental statement of facts is necessary. Plaintiff and defendant were married in 1919 and lived together until about May 31, 1942, when they

separated. Eight children were born of such marriage, five of whom, all girls, ranging in age from 7 to 21 years, were living at the time of trial. Plaintiff is about 42 and defendant about 54 years of age. In support of her allegations of extreme and repeated cruelty, plaintiff testified in part:

"When we went to town, I generally went after groceries or something essential and my husband went to a beer tavern.

"My husband used profanity towards me excessively. He called me a God-damned son-of-a-bitch, an old whore, a brainless idiot. He didn't use these words just occasionally, but almost every day. He used these terms in the presence of others, in the presence of our children and in the presence of our younger children. He used these terms in the presence of two or three of my friends.

"My husband threatened to do me bodily harm. He said he was going to kill me and hang me to a telephone pole. He made these threats before our children.

"My husband struck me and his conduct toward me made me afraid of him and nervous. It made me sick at times.

"On frequent occasions my husband was intoxicated. One night in May, 1942, just a few days before I left, he was intoxicated at our residence at about 12 o'clock at night. Mr. and Mrs. Minard, our younger daughters, Evelyn, Charlotte and Trinna Jean and myself were there. * * * My husband and Mr. Minard were intoxicated and quarrelled over the claim that Mr. Lund (defendant) had been familiar with Mrs. Minard. The quarrel took place in the presence of my children, and profanity was used. Mr. Lund threatened Mrs. Minard with violence. * * *

"My husband's attitude toward his children was that he wanted to be a dictator. He wanted to be God over them and tell them exactly what they could

do. He informed my children that they didn't have to mind me and only had to mind him. He did not furnish the necessary medical care for the children. * * *

"My husband didn't want my children to read anything. If we were reading he would just take the magazines and burn them up or if we had a book he would just kick it away. * * *

"I left Mr. Lund with the intention of separating from him because it got so I couldn't stand it to live with him any more. He never was good to me. He never came to the house but what he was swearing at me. I just couldn't stand it any more."

Their 14-year-old daughter Charlotte, called as a witness by plaintiff, testified in part:

"My father objected to our reading any literature or books of any kind. He objected to everything I read. I was even reading a book of fairy tales when he tore it out of my hands, kicked it and tore it all up. * * * My father said we didn't have to mind our mother. * * *

"I heard my father use swear words toward my mother. He called her a dirty old whore, a God-damned son-of-a-bitch, a dirty old bastard. He said he was going to take her clothes off and hang her to a telephone pole and let her freeze. He said these things recently, during the last six months my mother and father lived together.

"I saw my father hit and strike my mother. I saw him do it during the period between January and May, 1942. He would go into the kitchen and hit her just as hard as he could and then pretend it was a joke. * * * I was afraid of him. He was always so mean. He would bring up his fist as if to hit us when he spoke to us and he swore so much. * * *

"I heard my father threaten my mother. He said he would kill her. The last time he said it was just before we came here. * * *

"My father was intoxicated on frequent occasions that I know of. He was intoxicated a great deal of the time during the last six months my mother and father lived together. When he was intoxicated he would act silly, swear, and holler and get mad. He would bring liquor to our home.      *      *      *

"I haven't turned against my father. I was always afraid of him.      *      *      *      I don't call my father a drunkard because he wasn't drunk all of the time."

Their 21-year-old daughter Ruth, *called as a witness by her father,* testified in part:

"I left home in 1939. There were lots of reasons. I couldn't stand to see my mother and sisters mistreated.      *      *      *

"Always she was crying and he was doing something mean.      *      *      *

"Did I hear my father use profanity? Oh, always. Just like they said. He called her an old slut. Yes, he called her a son-of-a-bitch. Did he use the word God-damn quite often? Oh, always.

"When I visited my father after I was 18 years of age my father was always in an intoxicated condition when I was home. He would come home over week-ends and he would always drink. I can never remember a week-end that he didn't have a hangover. I was always afraid for my sisters and my mother. Not so much for myself or my sisters because kids can take a lot of hitting around. But I was always afraid for my mother.      *      *      *

"My mother's conduct toward my younger sisters was not reproachable in any way. She never drank, she never smoked, she never went any place but us children were with her. She never did anything wrong."

Their 19-year-old daughter Ethel, *called as a witness by her father,* testified in part:

"My father considers himself God, I guess. I can't remember my father acting very good to my

mother unless it was in the first stages when he was drinking. Then he was very happy, but after he took a little more he was very ugly. He would be mean to the children. Many times he hit my mother.
\* \* \*

"I have seen my father intoxicated many times. \* \* \* He used to throw things, that was a common occurrence. My mother would pick them up and clean up the mess afterwards. She would try to calm him down. My father used to mistreat my cat and dog. He was always hurting some animal that was small, some little animal.

"*Q.* Did you ever hear your father call your mother names?

"*A.* All my life.

"*Q.* What did he call her?

"*A.* Do I have to answer?

"*Q.* Yes.

"*A.* He called her a slut, and a whore, and \* \* \* a son-of-a-bitch."

One of the daughters testified that defendant said "he could have Mrs. Minard any time he wanted her and that he had had her." There was other evidence to his discredit, which it is unnecessary to relate. The trial court discredited the testimony of the daughters, but the superintendent of the school which three of them attended, and from which Ruth and Ethel were graduated, said that he had always found them honest and reliable and that "they seemed to be healthy, normal young ladies." Although, in some instances, the daughters' conduct might have been subject to criticism, we find no grounds for materially discrediting their testimony regarding their father's conduct.

There was ample testimony establishing plaintiff's good character and reputation in the community. A storekeeper who was also vice-president of the bank, called as a witness by defendant, testified, "I know that the reputation of Mrs. Lund in

and about the community of Sidney is all right."
A neighbor, also called as a witness by defendant,
testified that "there cannot nobody mar her repu-
tation." Defendant's cousin said, "I know Mrs.
Lund's reputation in the community. Her reputa-
tion is good."

Defendant denied that he had struck plaintiff or
that he had been intoxicated or drank excessively.
He denied calling her vile names or names imputing
immorality, but admitted he told her "she acted like
that." On direct examination he testified in part:

"*Q.* It has been testified you called her names
such as whore, son-of-a-bitch and other opprobrious
epithets. Did you ever call her that?

"*A.* No, I haven't. *I said she acted like that* but
I never called her those names."

Defendant's cousin and other witnesses testified,
in substance, that his character was good, that he
did not drink excessively, and that they never had
seen him abuse plaintiff or heard him call her vile
names. Defendant accused his wife of deceitful-
ness, but it reasonably appears that their disputes
and quarrels usually arose because of his attempt to
dominate and rule her and the children in a dicta-
torial, cruel, abusive, and iron-handed manner.

Reviewing the record *de novo,* we are convinced
that the evidence establishes ample grounds for
granting plaintiff a decree of divorce. The trial
court erred in dismissing her bill of complaint. See
*Goodspeed* v. *Goodspeed,* 300 Mich. 371; *Brookhouse*
v. *Brookhouse,* 286 Mich. 151; *McCue* v. *McCue,* 191
Mich. 1; *Emery* v. *Emery,* 181 Mich. 146; *Jarstfer*
v. *Jarstfer,* 162 Mich. 196; *Berryman* v. *Berryman,*
59 Mich. 605.

The parties own several parcels of real estate and
also some personal property aside from their house-
hold furniture and furnishings, and as they had

practically nothing at the time of their marriage, it may reasonably be inferred that the accumulation of such property resulted from their mutual efforts. Plaintiff is entitled to an equitable and proper share of such real and personal property.

It appears that plaintiff removed a substantial part of the household furniture and furnishings from the farm home at the time of their separation, and each party should retain and own that part of such furniture and furnishings now in his or her possession.

We recognize that because of her age and lack of business or industrial experience, plaintiff may find it difficult to support and maintain herself. A reasonable amount should be awarded for her support and maintenance, which amount should be subject to modification or change from time to time, depending upon the earnings, financial condition, and circumstances of the parties.

Plaintiff should be given the custody and care of the two youngest children, Charlotte and Trinna Jean, and defendant should pay a reasonable amount for their support and maintenance until they attain the age of 17 years. He should also pay a reasonable amount for plaintiff's attorney fees and pay the expenses necessarily incurred by her in connection with this suit and appeal.

The decree of the trial court dismissing plaintiff's bill of complaint is vacated and set aside. A decree may be entered in this court granting plaintiff an absolute divorce and giving her the custody and care of the two youngest children. Such decree shall provide for remanding the case to the circuit court for determination of the property rights of the parties, for the granting of an allowance for the support and maintenance of plaintiff and the two youngest children and for an allowance to plaintiff for her at-

torney fees and expenses.   Plaintiff shall recover
costs of both courts.

NORTH, C. J., and BUTZEL, BUSHNELL, BOYLES, and
REID, JJ, concurred with STARR, J.